**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA**

TAMMY L. SICELOFF, et al.,            )
                                      )
              Plaintiffs,             )
                                      )
       vs.                            )        No. 2:11-cv-00783-JFC
                                      )
THE TOWNSHIP OF WEST DEER, et al.,    )
                                      )
              Defendants.             )
                                      )

## MEMORANDUM OPINION

CONTI, District Judge

Pending before the court is the motion for summary judgment in part (ECF No. 33), brief in support (ECF No. 34), and concise statement of material facts with accompanying exhibits (ECF No. 35), filed by defendants the Township of West Deer (the "Township") and Brian Pazak, individually and in his official capacity as a Township police officer ("Officer Pazak" and together with the Township, the "defendants"). Plaintiffs Tammy L. Siceloff ("Mrs. Siceloff") and Hubert P. Siceloff (collectively "plaintiffs") filed a response (ECF No. 38), and a brief in opposition (ECF No. 38), to which defendants filed a reply. (ECF No. 40.) Defendants filed a combined concise statement of material facts (ECF No. 41), and plaintiffs filed a combined concise statement of material facts. (ECF No. 42.)

This case arises out of an interaction between Mrs. Siceloff and Officer Pazak during the execution of a warrant for the arrest of plaintiffs' son on or about September 29, 2008 (the "Incident"). As set forth in the facts below, plaintiffs filed suit claiming violations of Pennsylvania and federal law. The Township seeks summary judgment with respect to plaintiffs' civil rights claim asserted against it pursuant to 42 U.S.C. § 1983.

In support of its motion, the Township argues that the record is devoid of evidence from which a jury could reasonably conclude that it was aware of prior uses of excessive force by its officers before the Incident and deliberately failed to take appropriate corrective action. (ECF No. 33 at 2.) In opposition to the Township's motion, plaintiffs argue that the record establishes two prior occurrences of excessive force from which a jury could reasonably conclude: (1) the Township did not have an effective policy with respect to the use of non-deadly force by its police officers; (2) the Township failed to train adequately its police officers in the use of non-deadly force; and (3) the Township's ineffective policy and failure to train caused the alleged violations and injuries. (ECF No. 38 at 1-2.) The matter being fully briefed, it is now ripe for disposition. Because plaintiffs did not adduce sufficient evidence for a jury to reasonably find that the Incident was attributable to a municipal policy or custom, the court will grant the motion for partial summary judgment with respect to plaintiffs' § 1983 claim against the Township.

## I.   Factual Background

### A.   The Parties

Plaintiffs are adult individuals residing in Tarentum, Pennsylvania, which is located within the Township. (Siceloff Dep. (ECF No. 39-4) at 4:17.) The Township is a Pennsylvania municipal corporation, and Officer Pazak is a Township police officer residing in Tarentum, Pennsylvania. (Pazak Dep. (ECF No. 39-2) at 7:25.) At all times relevant to the present case, the Township employed Officer Pazak in his official capacity as a police officer. (ECF No. 39-2 at 26:9-26:10.)

### B.   The Incident Giving Rise to Plaintiffs' Claims

On September 29, 2008, a member of the Frazer Township ("Frazer Township") Police Department contacted Officer Pazak to request assistance for the execution of an arrest warrant

for plaintiffs' son, Scott Hopper ("Hopper"). At the time of the request, Officer Pazak was on duty as a Township police officer. (ECF No. 39-2 at 34:23-35:1.) Officer Pazak and his partner agreed to provide support and contacted two state constables to assist in Hopper's transportation to the Allegheny County Jail. (Id. at 35:3-35:8.)

After arriving at plaintiffs' home, Officer Pazak moved to a side-door on the right side of the residence, accompanied by an officer from Frazer Township who had the arrest warrant in his possession. (Id. at 38:23-25, 37:4-5.) The state constables and one other Township police officer moved into strategic positions around the home to prevent Hopper's flight. (Id. at 39:17-20.) Officer Pazak knocked on plaintiffs' side door, announcing the officers' presence and informing Mrs. Siceloff about the arrest warrant. (Id. at 39:13-14.) Mrs. Siceloff's and Officer Pazak's versions of the ensuing events differ in several respects. (ECF No. 34 ¶ 3.)

According to Mrs. Siceloff, Officer Pazak and the other officers arrived at plaintiffs' residence in the late afternoon and "pounded" on the screen door. (ECF 39-4 at 35:24-36:1.) Mrs. Siceloff spoke first, asking Officer Pazak why the officers were at her residence. (Id. at 36:2-13.) Officer Pazak asked Mrs. Siceloff if Hopper was in the home, and informed her about the warrant for his arrest, to which Mrs. Siceloff allegedly replied that she would go and retrieve Hopper. (Id.) Mrs. Siceloff testified that she stepped back from the door to answer the kitchen telephone, which began to ring as the officers spoke to her through the screen door. (Id. at 36:14, 38:7-11.) After hanging up on a telemarketer, restraining her two barking dogs, and continuing to converse with the officers, Mrs. Siceloff testified that Officer Pazak "hit" the screen, causing it to "fl[y] out" of the doorframe and strike her between the fingers of the left hand. (Id. at 40:18-42:16.) Mrs. Siceloff testified that Officer Pazak reached through the now-empty doorframe to "wrench open" the door and gain entry to the home, where he allegedly hit her in the chest with

his left arm as she attempted to remove a partition separating the kitchen from the dining area. (Id. at 42:17-22.) The force of the blow knocked her into the kitchen doorframe and onto the ground, causing injuries to her left arm. (ECF No. 39-6 at 45:3-4.) The other officers entered the home with Officer Pazak and proceeded up the stairs where they discovered and apprehended Hopper in the attic. (Id. at 5:25-6:3.) Mrs. Siceloff testified that less than five minutes elapsed from the time Officer Pazak knocked on the door to the time Hopper was taken into custody. (Id. at 6:4-6.)

According to Officer Pazak, Mrs. Siceloff approached the screen door in response to his initial knock and requested that the officers explain their presence. (ECF No. 39-2 at 40:1-21.) The Frazer Township officer displayed the arrest warrant "in plain view," but did not offer it to Mrs. Siceloff to read because "[she] would not open the door." (Id. at 40:20-41:10.) Mrs. Siceloff again asked the officers to explain their presence before she walked out of the kitchen without explanation. (ECF No. 39-3 at 5:6-10.) According to Officer Pazak the kitchen telephone never rang, Mrs. Siceloff did not tell the officers that she was going to retrieve Hopper, and she did not attempt to secure the dogs using a partition or gate. (ECF No. 39-2 at 41:25; ECF No. 39-3 at 1-13.) Officer Pazak attempted to open the locked screen door[1] leading into the home. (ECF No. 39-3 at 1:14-19.) After warning Mrs. Siceloff for approximately one minute that he "would be forced to gain entry" if she did not open the door, Officer Pazak pushed the screen out of the door and entered the home. (Id. at 4:6-12.) Officer Pazak testified that the screen fell to the bottom of the doorframe without contacting Mrs. Siceloff, who had moved to the bottom of the staircase in the living room. (Id. at 4:13-17.) As the officers moved toward the stairs, Mrs. Siceloff crossed in front of the officers' path, but Officer Pazak testified that his body never

---

[1] Mrs. Siceloff asserts that the screen door was designed such that the door handle turned to the left instead of the right like a "normal" door. (ECF No. 39-6 at 3:18-22.) She contends that Officer Pazak likely tried to turn the door handle to the right instinctively, which lead to his assertion that the door was locked from the inside. (Id.)

4

touched her in any way during the Incident. (<u>Id.</u> at 7:2-13; 4:24-5.) Officer Pazak claimed that he did not see Mrs. Siceloff laying on the ground and did not see anyone push her to the ground. (<u>Id.</u> at 10:12-18.) The officers searched upstairs, eventually locating and apprehending Hopper in the attic. (<u>Id.</u> at 13:2-20.)

###    C.    <u>The Township's Policy With Respect to the Use of Force</u>

Plaintiffs submitted to the court relevant sections of the Township's police department policy manual (the "Manual"), which sets forth, <u>inter alia</u>, guidelines with respect to the use of both deadly and non-deadly force. (ECF No. 39-1.) Pursuant to the Manual, the Township requires that its police officers engage in "a careful balancing of all human interests" before using "only that force which is reasonably necessary to effectively bring an incident under control" during the course of "protecting the lives of the officer or another." (<u>Id.</u> at 2.) The Manual defines deadly force as "[a]ny use of force that is likely to cause death or serious bodily harm," and non-deadly force as "[a]ny use of force other than that which is considered deadly force." (<u>Id.</u>)

With respect to the use of non-deadly force, Township officers must first "assess the incident, if possible, in order to determine which non-deadly technique or weapon will best bring the incident under control in a safe manner" when the use of deadly force is not "authorized." (<u>Id.</u> at 3.) Only after this assessment may officers "use non-deadly force techniques and issued equipment for resolution of incidents" in order to: (a) "protect themselves or another from physical harm"; (b) "restrain or subdue a resistant individual"; or (c) "bring an unlawful situation safely and effectively under control." (<u>Id.</u>) Authorized non-deadly force "weapons and methods" include, <u>inter alia</u>, "defense tactics in which departmental training has been given to control or arrest uncooperative suspects." (<u>Id.</u> at 5.)

The Manual sets forth "[e]scalating levels of force," moving from: (1) "[v]erbal [p]ersuasion"; to (2) "[m]inor physical force (taking a suspect/prisoner by the arm as a physical type of persuasion)"; to (3) use of pepper spray; to (4) "[d]efensive tactics" resulting in the "suspect/prisoner being subdued," including "placing hands behind the back for handcuffing"; to (5) use of batons or flashlights; and ending at (6) employment of "[d]eadly force." (Id. at 5-6.) The Manual does not require officers to proceed from level to level, but emphasizes that "[i]t is impossible to control at which level of force any particular use of force incident will begin or how quickly and in what steps it might escalate." (Id. at 6.) Officers are accordingly advised that the "most important thing to remember concerning the use of force is that an officer **must use judgment** each time a use of force incident occurs" based upon "training along with the circumstances associated with the incident." (Id.) (emphasis added).  Officers must "always remember that, whatever the circumstances are, only the minimum amount of force necessary will be used to preserve the peace, prevent the commission of offenses, effect lawful arrests' [sic] or defend persons or property." (Id.)

### D.     Officer Pazak's History, Training, and Knowledge of the Township's Policy

The record reflects that Officer Pazak entered the Allegheny County Police Academy (the "Academy") in January 2004 after studying criminal justice for one semester at the Community College of Allegheny County. (ECF No. 39-2 at 10:11-23.) Officer Pazak graduated from the Academy in June 2004 after passing courses in, inter alia, "criminal law," "vehicle law," "defensive tactics," "driving," "EMS and CPR," "physical training," "ethnics,"[2] "report writing," "accident investigation," "basic" Pennsylvania and federal constitutional law, "firearms," "traffic stops," and "mere encounter." (Id. at 11:9-14:21.) Officer Pazak did not, however, take a course

---

[2] Officer Pazak testified that he took "ethnics classes" where he learned "about peoples' [races]…." (ECF No. 39-2 at 12:16-22.)

providing particularized instruction with respect to "going to people's homes and serving warrants." (Id. at 14:22-24.)

In November 2004, Officer Pazak began working for the Cheswick Township police department in Allegheny County where he performed "all the duties of a police officer" for approximately eight to sixteen hours per week. (Id. at 18:4-12.) During this period Officer Pazak completed a "probationary training period" consisting of a forty-hour period in which he "pair[ed] up" with the Cheswick police chief to "type reports" and "enter accident reports." (Id. at 19:9-20:1.) Officer Pazak was given a Cheswick Township police department policy manual and released for solo duty. (Id. at 20:5-11.) In February 2005, Officer Pazak worked in Tarentum, Pennsylvania, and Cheswick, Pennsylvania, concurrently for approximately thirty-two hours per week until 2008, when he began working for the Frazer Township police department. (Id. at 20:16-23:16.) During this time Officer Pazak completed "firearms qualifications," but received "no [written] guidance," and "no training manuals" except for each municipality's respective policy manual. (Id. at 21:19-22:6.) Officer Pazak also worked shifts for the East Deer Township police department from approximately June 2005 until August 2008. (Id. at 25:5-16.)

In approximately February 2008, Officer Pazak began to work for the Township while continuing to work for Frazer Township. (Id. at 26:4-10.) The Township required that Officer Pazak complete a three-to-four week "training probationary period." (Id. at 27:8-18.) He was, however, not required to "train as long as some of the others" because he was "a resident of [the Township], went to high school in [the Township],…and [he] knew the streets and the area." (Id.) Officer Pazak, however, did ride with full-time "field training officer[s]" after receiving the Manual. (Id. at 27:19-25.) The Township provided Officer Pazak with "ongoing training,"

including "defensive tactics" and "firearms qualifications" two to three times a year. (ECF No. 39-2 at 34:25-35:17.)

Officer Pazak testified that he had never been disciplined by any of his employers dating back to his employment with Cheswick Township, and had never had any "citations" or "counseling" for any violations. (Id. at 28:21-29:1.) Officer Pazak stated that no one had ever filed a complaint against him with any police department or municipality since his employment with Cheswick Township, with the exception of "one other incident," which is not elaborated upon in the record. (Id. at 29:2-15.) Officer Pazak testified that, as of the date of the Incident, he had executed "less than 10" arrest warrants in both primary and assistive capacities. (Id. at 33:7-10.)

When asked to describe the Township's policy with respect to the use of force, Officer Pazak testified that Township officers were authorized to use the "necessary amount of force…to deescalate whatever situation." (Id. at 37:4-13.) He could not, however, recall the "exact verbiage" of the policy. (Id.) When asked if the Township required its officers to adhere to a particular "progression" or force continuum when authorized to use force, Officer Pazak testified that "[t]here is no progression" or "protocol," and that decisions concerning the appropriate level of force are left to the officer's discretion. (Id. at 37:14-23.) Officer Pazak recalled one prior occurrence of excessive force involving another Township officer who had since resigned. (Id. at 37:24-38:6.) He, however, could not recall the Township's response to that alleged incident, and did not provide further detail. (Id.) Officer Pazak testified that Township employees investigated the Incident in conjunction with the police chief, but he was unaware of any official report or memorandum "discussing the use of force" as a result of the instant suit. (Id. at 39:3-40:1.)

E.    **Mrs. Siceloff's Knowledge About Prior Constitutional Violations**

Mrs. Siceloff testified that she knew about alleged prior unconstitutional conduct by Officer Pazak from "people talking" in the Township. (ECF No. 39-6 at 26:14-25.) She claimed to know about two other women who brought excessive force claims against Officer Pazak, but she did not know the women by name and could give no further information with respect to those instances. (Id. at 27:1-15.) Mrs. Siceloff testified that she knew about the alleged incidents only from discussions occurring while she was "just out talking with people in the [T]ownship" after others "f[ound] out" about her incident with Officer Pazak. (Id. at 27:22-28:5.) Mrs. Siceloff, however, could not recount the identity of any of the individuals. (Id. at 15-16.) She also confirmed that she never spoke with Township officials, the Township's police chief, or any other Township authority regarding the Incident. (Id. at 28:9-12.)

II.    **Procedural History**

Plaintiffs filed the instant lawsuit in the Court of Common Pleas of Allegheny County, Pennsylvania, on May 29, 2010. (ECF No. 1.) Defendants removed the case to this court on June 13, 2011, under this court's federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Plaintiffs' amended complaint alleged four violations of Pennsylvania common law: assault (Count I); negligence (Count II); malicious prosecution (Count IV); and loss of services (Count VI). Plaintiffs also asserted two claims pursuant to 42 U.S.C. § 1983 premised upon a Fourth Amendment claim of excessive force against Officer Pazak (Count III) and a Fourth Amendment claim against the Township for enforcement of a constitutionally violative "policy" or "custom" that resulted in her injuries (Count V). (ECF No. 9.) On August 8, 2011, defendants filed a motion to dismiss plaintiffs' amended complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure

12(b)(6). (ECF No. 14.) On November 7, 2011, this court ruled on that motion, dismissing without prejudice Counts II and IV and denying dismissal with respect to Counts I, III, V, and VI. The parties concluded discovery on July 18, 2012, and defendants now seek partial summary judgment with respect to Count V of the amended complaint.

## III.   **Summary Judgment Standard:**

Federal Rule of Civil Procedure 56 provides in relevant part:

**(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
….

**(c) Procedures.**

**(1) *Supporting Factual Positions*.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party, and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); see Woodside v. Sch. Dist of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

When the nonmoving party bears the burden of proof at trial, the moving party may discharge its burden by pointing out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Once the moving party has made this showing, the burden shifts to the nonmoving party, who cannot simply rest on the allegations in the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec., 475 U.S. at 586. Summary judgment is proper in cases

where the nonmoving party's evidence in opposition is "merely colorable" or "not significantly probative." <u>Anderson</u>, 477 U.S. at 249-50.

IV.    **<u>Discussion</u>**

The Township is asserting that, as a matter of law, judgment must be entered in its favor with respect the only remaining claim against it—Count V. In that count, plaintiffs allege § 1983 liability against the Township on two grounds: (1) the Township enforced an unconstitutional "policy" with respect to the use of force as evidenced by the Manual's broadly defined requirements and the two prior instances of excessive force; and (2) the Township's failure to train its police officers in the use of force amounted to a "custom" of acquiescence to misconduct as evidenced by Officer Pazak's limited training, his lack of knowledge with respect to the Manual's requirements, and the Township's failure to take corrective action in response to the two prior incidents of excessive force. (ECF No. 9 at 12-16; ECF No. 38 at 1-2; ECF No. 39 at 6-8.) Plaintiffs assert that the Township's policy or custom was the "moving force" behind Officer Pazak's alleged violation of Mrs. Siceloff's Fourth Amendment rights. (ECF No. 9 at 12-16; ECF No. 38 at 1-2; ECF No. 39 at 6-9.)

The Township argues in support of its motion for partial summary judgment that the record is devoid of evidence from which a jury could reasonably conclude that the Township was made aware of prior uses of excessive force by its officers and made a deliberate choice not to take appropriate corrective action in response. (ECF No. 33 at 2; ECF No. 34 at 7.) The Township contends, in any event, that the record does not support a reasonable basis for a jury to find that Officer Pazak's alleged use of force occurred as a direct result of the Township's enforcement of a policy or custom of excessive force. (ECF No. 34 at 7.)

A.    **<u>§ 1983 General Framework—Municipal Liability</u>**

Section 1983 authorizes an injured plaintiff to assert a claim for relief against a person who violated the plaintiff's federally protected rights while acting under color of state law.[3] 42 U.S.C. § 1983. In order to state a claim pursuant to § 1983, a claimant must allege that: (1) the defendant was a person; (2) the defendant acted under color of state law; and (3) the defendant's actions actually caused a deprivation of a right guaranteed by the United States Constitution or federal law. Anderson v. Davila, 125 F.3d 148, 159 (3d Cir. 1997). "[M]unicipalities and other local government units [are] to be included among those persons to whom § 1983 applies." Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978). The Township is a municipal corporation, and is thus a "person" for § 1983 purposes. Id.

A municipality, however, is not liable for the actions of its employees or agents under § 1983 unless the plaintiff is able to establish that the violation of his or her constitutional or federal rights was attributable to the enforcement of a municipal "policy" or "custom."[4] Monell, 436 U.S. at 694; see City of St. Louis v. Praprotnik, 485 U.S. 112, 121-23 (1988). A municipality's liability for a failure to train its employees rises to the level of a policy or custom only where the failure amounts to a "deliberate indifference" to the constitutional rights of the persons with whom the police come in contact. Doe v. Luzerne Cnty., 660 F.3d 169, 179 (3d Cir. 2011). Under Monell, there is no cognizable *respondeat superior* theory of municipal liability. A municipality may not be held vicariously liable for the actions of its employees under § 1983.

---

[3] Section 1983 provides in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…." 42 U.S.C. § 1983.

[4] The Court in Monell held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983." Monell, 436 U.S. at 694. The Court of Appeals for the Third Circuit has noted: "Our jurisprudence is clear that '[w]hen a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom.'" McTernan v. City of York, 564 F.3d 636, 657 (3d Cir. 2009) (quoting Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996)).

Monell, 436 U.S. at 691. A municipality can only be held liable under § 1983 where the alleged violation is attributable to the enforcement of a municipal "policy" or "custom." Id. at 691-92. A policy is made "when a 'decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action issues an official proclamation, policy, or edict.'" Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). A custom is a practice "'so permanent and well-settled' as to virtually constitute law," which requires proof of "knowledge and acquiescence by the decisionmaker." Id.; see McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009).

The policy or custom at issue must also reflect or result in "deliberate indifference" to persons' constitutional rights. Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004). "It is a particularly willful type of recklessness that is inherent in the deliberate indifference standard." Simmons v. City of Phila., 947 F.2d 1042, 1060 n.13 (3d Cir. 1991). A plaintiff must present "evidence of such indifference on the part of…officials with the authority to make municipal policy." Id. at 1059. Thus, "absent the conscious decision or deliberate indifference of some natural person, a municipality, as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy [or] a custom…" Id. at 1063.

A municipality cannot be liable under § 1983 unless its policy or custom is the "moving force" behind the constitutional violation. Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir. 2006). In order to be considered a "moving force," the plaintiff must establish a direct causal link between the municipality's enforcement of a deliberately indifferent policy or custom and the alleged constitutional incursion. City of Canton v. Harris, 489 U.S. 378, 390 (1989).

### B.     The Township's Policy With Respect to the Use of Force

Plaintiffs argue that the Township enforced an unconstitutional "policy" with respect to

the use of force, and that its officially promulgated policy—the Manual—"proximately caused" the alleged violations and injuries in this case. (ECF No. 38 at 1-2; ECF No. 39 at 6-8.) In support, plaintiffs argue that the Manual's guidelines regarding the use of force are "so broad and general" that they are "in fact no policy at all." (ECF No. 39 at 7.) According to plaintiffs, the Manual's broad language demonstrates that the Township, in essence, "tell[s] its police officers to look at the situation where they find themselves, then do what you think you need to do." (Id.) Plaintiffs note that "the use of force in serving an arrest warrant is not [specifically] addressed" by the Manual. (Id. at 6.)

In Simmons, the Court of Appeals for the Third Circuit set forth the applicable test with respect to determining whether a municipality may be held liable on the basis of a policy that allegedly lead to a deprivation of constitutional rights in violation of § 1983. The court in Simmons looked to Monell and its progeny to conclude that a party seeking to impose liability on the basis of a municipal policy or custom must show that a final decisionmaker acted with "deliberate indifference" to constitutional rights. Simmons, 947 F.2d at 1064. Plaintiffs must further show that the final policymaker acted with scienter in failing to correct the policy, including being aware of the problem and potential solutions, yet "deliberately chose" not to pursue them. Id.

Here, plaintiffs failed to produce any probative evidence establishing that the Township's enforcement of the Manual's provisions regarding the use of force amounted to a deliberately indifferent policy. Although the parties appear to agree that the Manual amounts to a "policy" for § 1983 purposes, plaintiffs merely assert their own subjective appraisal of the Manual as evidence without precedential support, departmental policy comparison, empirical data, evidence from Township officials regarding alternatives, or other legal authority. Plaintiffs failed to

identify *any* policymaker, final or otherwise, who is allegedly responsible for the policy at issue in the present case. Plaintiffs also do not satisfy the scienter requirement insofar as they adduce no evidence that decisionmakers in the Township knew about other alleged instances of excessive force or that they deliberately chose not to address the problems raised by those instances. The record instead reflects that Officer Pazak was never disciplined by Township authorities for any incident involving excessive force.

In the absence of such evidence, plaintiffs rest on the conclusory statements in their pleadings, simply showing "that there is some metaphysical doubt as to the material facts." Matsushita Elec., 475 U.S. at 586. Here, plaintiffs presented only unsupported, conjectural assertions, and merely argued in opposition to the Township's motion. Those assertions are "merely colorable" and "not significantly probative." Anderson, 477 U.S. at 249-50.[5] Plaintiffs did not implicate a Township policy that would warrant liability under Monell.[6]

It is well established that the unconstitutional execution of an otherwise valid policy is not cognizable under § 1983. In City of Canton, a detainee filed suit against a municipality under § 1983 alleging violations of her Fourteenth Amendment right to receive necessary medical

---

[5] See the discussion with respect to the pattern theory, *infra*, at § (IV)(C)(2).

[6] Persuasive authority exists with respect to this issue. In Garner v. Memphis Police Department, 8 F.3d 358, 360-61 (6th Cir. 1993), the father of a fifteen-year-old boy killed by city police officers filed suit under § 1983 challenging the city's policy with respect to the use of deadly force. City authorities taught the officers that it was proper under Tennessee law to kill a fleeing felon rather than run the risk of allowing him to escape. Id. A Tennessee statute provided "[i]f, after notice of the intention to arrest the defendant, he either flees or forcibly resists, the officer may use all the necessary means to effect the arrest." Id. The Memphis Police Department's policy on the use of deadly force—which was signed by the director of the Memphis police and later supported by the Mayor in deposition—was slightly more restrictive than the statute, but still allowed the use of deadly force in cases of burglary. Id.

The plaintiff in Garner propounded evidence showing specific city policymakers' decisions to enact a use of force policy allowing deadly force to stop fleeing burglars in light of various alternatives. Id. at 364. The plaintiff demonstrated that the city's police department implemented specific training programs which taught officers that it was proper to shoot fleeing burglary suspects in order to prevent escape. Id. Thus, the officers were acting pursuant to official policy promulgated by the city. Id. Plaintiffs in the instant case adduced no such evidence and failed to point to *any* Township official, let alone one responsible for deliberately choosing the Manual's guidelines in light of various alternatives. Plaintiffs do not point to a specific Township training program which instructed officers to use excessive force while executing arrest warrants or other police duties. There is no evidence that Township officials acted with deliberate indifference with respect to the use of force.

attention while in police custody. <u>City of Canton</u>, 489 U.S. at 381-82. The plaintiff challenged,

<u>inter alia</u>, the municipality's official policy manual regarding medical care, which stated broadly

that the city jailer "shall…[have a person needing medical care] taken to a hospital for medical

treatment, with permission of his supervisor…." <u>Id.</u> at 386-87. The Court found that "there could

be little doubt that on its face the city's policy regarding medical treatment for detainees [was]

constitutional," and that it was "difficult to see what constitutional guarantees [were] violated by

such a policy." <u>Id.</u> at 387-88. The Court noted that "without more…a city [would not be]

automatically…liable under § 1983 if one of its employees happened to apply [the city's] policy

in an unconstitutional manner" because liability "would then rest on *respondeat superior*" in

violation of <u>Monell</u>. <u>Id.</u> at 387.

      In the instant case, plaintiffs' claim against the Township essentially avers the type of

*respondeat superior* liability foreclosed by <u>Monell</u> and its progeny. Even if the court assumes,

<u>arguendo</u>, that Officer Pazak happened to apply the Manual in an unconstitutional manner during

the Incident, no liability would attach pursuant to <u>Monell</u> absent a showing of deliberate

indifference, which has not been established in this case. <u>Simmons</u>, 947 F.2d at 1064. Therefore,

Count V can only survive defendants' motion for summary judgment if there are sufficient facts

for a reasonable jury to find there was a failure to train.

      C.    <u>**The Township's Training of its Police Officers**</u>

      Plaintiffs argue that Officer Pazak's alleged use of excessive force during the Incident

and two prior instances of excessive force demonstrate the Township's custom of deliberate

indifference toward the need to train its officers in the use of force. (ECF No. 38 at 1-2.)

Plaintiffs allege that the Township did not properly train Officer Pazak in accordance with the

Manual because the Incident presented "no threat of physical harm to anyone...[,] [n]o one was

resistant or in need of restraint…[, and] [n]o unlawful situation existed that had to be brought

under control." (ECF No. 39 at 8.) Finally, plaintiffs argue that the Township's failure to train

Officer Pazak "resulted in" the alleged violation because, if Officer Pazak "had any training

what-so-ever [sic]," he would have "made the analysis that there was no need to use the

excessive force." (Id.)

In support of these contentions, plaintiffs argue that the Township did not provide "any

training for [Officer] Pazak, or its other officers" regarding the use of non-deadly force during

the "prosecution of…patrol duties," and "specifically with regard to the service of a search

warrant at a suspect's home." (ECF No. 39 at 7.) Plaintiffs assert that Officer Pazak "only had

the basic training course at the Allegheny County Police Academy," along with two days of

"annual retraining" focusing on weapons and self-defense; the Township only required Officer

Pazak to ride with fulltime officers for a three-to-four week probationary training period; Officer

Pazak had no specific training with respect to the execution of arrest warrants while at the

Academy; and that Officer Pazak was unaware of the Township's policy regarding the escalating

levels of force. (Id.) Finally, plaintiffs contend that the record establishes "two prior incidents" of

excessive force from which a jury could reasonably conclude that the Township's failure to train

its officers amounted to a custom of excessive force. (ECF No. 38 at 1-2.) Despite these

allegations, the record does not support plaintiffs' failure to train claim under a either a pattern or

single-incident theory.

### 1.   § 1983 Failure to Train Framework

Only in "limited circumstances" can a municipality's decision not to train certain

employees with respect to their legal duty to avoid violating citizens' rights rise to the level of a

custom for purposes of § 1983. Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011). A

municipality's liability under § 1983 is "at its most tenuous" where a claim turns on a failure to train. Id. (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822-823 (1985) (stating that a custom of "inadequate training" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell"). The plaintiff must, therefore, identify a municipal custom "amounting to a deliberate indifference to the constitutional rights of the persons with whom the police come in contact." City of Canton, 489 U.S. at 887; Doe, 660 F.3d at 179; Carswell, 381 F.3d at 244.

Deliberate indifference is a "stringent standard of fault," requiring proof that a municipal actor "disregarded a known or obvious consequence of [his or her] action." Connick, 131 S. Ct. at 1360 (citing Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997)); see Doe, 660 F.3d at 179-78 (stating that a failure to train claim requires proof of a "deliberate or conscious choice by the municipality"). Thus, when municipal policymakers are on "actual or constructive notice that a particular omission in their training program causes municipal employees to violate citizens' constitutional rights, the municipality may be deemed deliberately indifferent if the policymakers choose to retain that program." Id. (citing Bryan Cnty., 520 U.S. at 407). As with the policy theory of municipal liability, the Court of Appeals for the Third Circuit requires the plaintiff to adduce scienter-like evidence of the indifference to ineffective training. Simmons, 947 F.2d at 1060-61. The municipality's "'policy of inaction,'" in light of notice that its training program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." City of Canton, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure to train claim "would result in de facto respondeat superior liability on municipalities…." Id. Municipal liability under § 1983 attaches "where—and only where—a deliberate choice to follow a course of action is made from

among various alternatives by [relevant municipal] officials….” <u>Simmons</u>, 947 F.2d at 1060.

A “pattern of similar constitutional violations by untrained employees is ‘ordinarily necessary’ to demonstrate deliberate indifference” for purposes of failure to train. <u>Connick</u>, 131 S. Ct. at 1360 (citing <u>Bryan Cnty.</u>, 520 U.S. at 409). Policymakers’ “continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish” deliberate indifference “necessary to trigger municipal liability.” <u>Id.</u> “Without notice that a course of training is deficient in a particular respect,” municipal policymakers “can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.” <u>Id.</u>

Finally, the plaintiff must demonstrate that the identified training deficiency is closely related to the ultimate injury such that it “actually caused” it. <u>See</u> <u>Connick</u>, 131 S. Ct. at 1358 n.5; <u>City of Canton</u>, 489 U.S. at 391; <u>Doe</u>, 660 F.3d at 180.

## 2.    **Pattern Theory**

Plaintiffs failed to adduce evidence sufficient for a reasonable jury to find that the Township’s alleged failure to train its officers amounted to a deliberately indifferent custom that actually caused a deprivation of Mrs. Siceloff’s constitutional rights. <u>City of Canton</u>, 489 U.S. at 388. The record is devoid of evidence demonstrating that the Township knew its training regimen overlooked a critical area where citizens’ constitutional rights were placed in jeopardy. Plaintiffs failed to present anything beyond unsupported argument that the Township’s existing training regimen is insufficient to fulfill its duty to train its officers in an area essential to the protection of citizens' rights. Plaintiffs seek to meet their burden by simply asserting a series of premises about a purported lack of knowledge on the part of Officer Pazak about how to handle the Incident. Plaintiffs rely on perceived shortcomings regarding the Township’s training and

20

Officer Pazak's alleged response to the Incident. Even if these assertions are based on facts not reflected in the record, "a municipality's deliberately indifferent failure to train is *not* established by: (1) presenting evidence of the shortcomings of an individual; (2) proving that an otherwise sound training program occasionally was negligently administered; or (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct." Simmons, 947 F.2d at 1060 (citing City of Canton, 489 U.S. at 390-91) (emphasis in original).

Plaintiffs do not identify any prior incident where Township officers violated a citizen's Fourth Amendment rights beyond speculative assertions overheard from "people talking" in the Township. These assertions do not supply a basis from which the finder of fact could conclude that Township policymakers knew or should have known that continued adherence to the training regimen utilized by its police department would result in violations of citizens' Fourth Amendment rights. See Connick, 131 S. Ct. at 1360. Plaintiffs failed to adduce evidence that Officer Pazak or any other officer had ever been disciplined by the Township for any misconduct engaged in while working for the Township. Plaintiffs failed to produce evidence demonstrating that the Township failed to take appropriate corrective action to any alleged violations. There is not a basis in the record for a reasonable jury to find any specific Township policymakers made a conscious choice to continue with a constitutionally deficient training program in light of nonviolent alternatives. See Connick, 131 S. Ct. at 1360.

Even if the court assumes for the sake of argument that plaintiffs' assertions with respect to the two prior excessive force claims against Township officers are factually supported, occasional violations generally do not rise to the level of a policy or custom. The United States Supreme Court and the Court of Appeals for the Third Circuit require much more. In Connick, the plaintiff was wrongfully imprisoned for eighteen years after a county prosecutor's office (the

"DA's office") failed to disclose exculpatory evidence as required by Supreme Court precedent (a "Brady violation"). Connick, 131 S. Ct. at 1355. After the state court overturned his convictions, the plaintiff sued under § 1983 alleging the DA's office failed to train prosecutors with respect to their duty to disclose exculpatory blood evidence, and the lack of training caused the nondisclosure and resulting constitutional violation. Id. at 1356-57.

While the plaintiff in Connick did not base his claim on a pattern of misconduct, he pointed to *four* prior judicially-confirmed Brady violations and subsequent conviction reversals as evidence of a "pattern" of similar misconduct by the DA's office. Id. at 1360. The Court, however, held that the prior Brady violations "*could not* have put [the DA's office] on notice that the office's [Brady] training was inadequate *with respect to the sort of* [Brady violation] *at issue*. . . ." Id. (emphasis added). The Court required a high degree of similarity, stating that "[n]one of those [prior Brady violations] involved [a] failure to disclose blood evidence, a crime lab report, or physical or scientific evidence" like the Brady violation at issue in the plaintiff's claim. Id. In the instant case, plaintiffs failed to identify adequately even one instance of judicially-confirmed excessive force[7] perpetrated by Township officers in the course of executing an arrest warrant, let alone one demonstrating the high degree of similarity and specificity required by the Court in Connick. Plaintiffs did not adduce sufficient evidence of a pattern for this claim to survive the Township's motion for partial summary judgment with respect to Count V.

### 3.    Single-Incident Theory

---

[7] Plaintiffs ask this court to take notice of a case pending in the Court of Common Pleas of Allegheny County, Pennsylvania, at GD08-024703 against the Township alleging that Officer Pazak and another Township police officer used excessive force during another incident. (ECF No. 42 ¶ 4.) The court notes that the suit referenced by plaintiffs was not filed until November 18, 2008 by praecipe for a writ of summons, and the complaint was not filed until November 8, 2010. (Id.) The Incident took place approximately two months prior to the filing of the praecipe, and the Township could not have known about that suit until after the Incident occurred. The other suit has no evidentiary value in this case. In addition, the other suit is not resolved, and it remains unclear whether liability will be imposed for the use of excessive force. As noted, the plaintiff in Connick pointed to *four* prior *judicially-confirmed* Brady violations and subsequent conviction reversals as evidence of a "pattern" of similar misconduct by the DA's office. Connick, 131 S. Ct. at 1360.

The plaintiff in Connick asserted a theory of "single-incident" § 1983 municipal liability, arguing that the single Brady violation in his case was the "'obvious' consequence of the DA's office's failure to provide specific [Brady] training" to prosecutors and that a showing of "obviousness" could "substitute for the pattern of violations ordinarily necessary to establish municipal culpability." Id. at 1361. The Court in Connick first acknowledged the possible existence of § 1983 single-incident municipal liability as hypothesized in City of Canton:

> In [City of Canton], the Court left open the possibility that, in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference. The Court posed the hypothetical example of a city that *arms its police force with firearms* and deploys the armed officers into the public to capture fleeing felons *without training the officers* in the constitutional limitation on the use of *deadly force*. Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights, the Court theorized that *a city's decision not to train the officers about constitutional limits on the use of deadly force* could reflect the city's deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights. The Court [in City of Canton] sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.

Id. (emphasis added; internal quotations and citations omitted). The Court in Connick, however, held that the plaintiff's single-incident theory could not survive the defendant's motion for judgment as a matter of law because, unlike the situation hypothesized in City of Canton, prosecutors entered the profession "equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment." Id. at 1361. They did not lack the requisite training. Id.

In the instant case, plaintiffs did not adduce evidence from which a jury could reasonably conclude that the execution of an arrest warrant at a private home in particular presents a situation so different from other areas of police work such that the Township's failure to provide

specific training in that area amounted to deliberate indifference to an "obvious" need. Id. Police officers are required to exercise constitutional discretion when applying force *at all times* during the course of their duties, and there is no evidence beyond plaintiffs' bare assertions establishing any particular need with respect to the execution of an arrest warrant at a private home. In City of Canton, the Court set the bar much higher in hypothesizing that a municipality's failure to provide *any* training to "novice, police academy applicants*"* in the use of "*deadly"* force when pursuing fleeing felons before releasing them into the public *"may"* be so obvious as to demonstrate deliberate indifference. City of Canton, 489 U.S. at 390 n.10 (emphasis added). Plaintiffs fail to meet this stringent standard. As stated, Officer Pazak graduated from the Academy by completing courses in, inter alia, "criminal law," "vehicle law," "defensive tactics," "driving," "EMS and CPR," "physical training," "ethnics," "report writing," "accident investigation," Pennsylvania and federal constitutional law, "firearms," "traffic stops," and "mere encounter." (ECF No. 39-2 at 11:9-14:21 (emphasis added).) The Township provided Officer Pazak with a probationary training period and requires annual retraining. Officer Pazak was not a novice police officer, having worked for three other municipal departments before his employment with the Township. Plaintiffs fail to produce any evidence that demonstrates that the Township's requirements and training regimen were constitutionally deficient.

In Simmons, the plaintiff sued the City of Philadelphia under various theories of § 1983 municipal liability for its failure to prevent her son from committing suicide while in police custody. Simmons, 947 F.2d at 1050. The plaintiff alleged, inter alia, that the City failed to train properly its employees in the prevention of suicide of intoxicated detainees and that the City's custom led to her son's death. Id. The Court of Appeals for the Third Circuit held:

> As a predicate for establishing…[the] theory that the City violated Simmons's rights by means of a deliberately indifferent failure to train, plaintiff must…have

> shown that such policymakers, likewise knowing the number of suicides in City
> lockups, either *deliberately chose not to provide officers with training in suicide
> prevention* or *acquiesced to a longstanding practice or custom of providing **no**
> training in this area*.

Id. at 1064 (emphasis added). As required in Simmons, and as defendants argue correctly in their

motion, plaintiffs did not produce *any* evidence establishing that Township officials were aware

of alleged prior instances of excessive force and made a deliberate choice to not take appropriate

corrective action or provide any training in the use of force. Simmons, 947 F.2d at 1062.

### D.   Causation

Plaintiffs in this case failed to show a deliberately indifferent municipal policy or custom.

The United States Supreme Court in Connick held that:

> "Because we conclude that [the plaintiff] failed to prove deliberate indifference,
> we need not reach causation. Thus, we do not address whether the alleged training
> deficiency, or some other cause, was the moving force that actually caused the
> failure to disclose the crime lab report.

Connick, 131 S. Ct. at 1358 n.5 (internal quotations omitted). Without a constitutionally deficient

municipal policy or custom of deficient training upon which to rely, there can be no causation

element, and analysis with respect to causation in this case is unnecessary.

Even if causation needed to be addressed, plaintiffs did not adduce sufficient evidence of

causation. In support of their causation argument, plaintiffs cite language from a Third Circuit

Court of Appeals' decision in which the court affirmed a grant of summary judgment with

respect to a Fourteenth Amendment racial profiling claim pursuant to § 1983. Watson v.

Abington Twp., 478 F.3d. 144, 157 (3d Cir. 2007). In Watson, a restaurant owner filed suit

against a municipal police department alleging, among other things, that its officers engaged in

unconstitutional racial profiling under color of state law to conduct raids, set up traffic

checkpoints, and generally harass patrons at the restaurant. Id. at 147-50. Relying on Monell, the

court found that the plaintiffs failed to adduce sufficient evidence to raise a triable issue of fact with respect to causation. Id. at 157. The evidence was "simply too general" to establish municipal liability, which typically requires that the alleged constitutional violation actually occur from the specific alleged custom. Id. In Watson, the plaintiffs only produced evidence establishing racial profiling in traffic stops a decade earlier. Id. This was too far removed in both nature and time to satisfy the requirement of a "sufficiently close causal link between…a known but uncorrected custom…and a specific violation." Id. (citing Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990)).

The facts in Watson provide little help to plaintiffs. In Watson, the court found evidence demonstrating a policy or custom of racial profiling from a decade earlier too "general" to establish causation because of the length of time that had passed between those actions and the actions giving rise to the suit. Watson, 478 F.3d. at 157. In the present case, plaintiffs only make assertions about alleged prior instances of excessive force. As discussed above, these assertions are too general to form the basis of a failure to train claim, must less satisfy the causation requirement. Further, neither cotemporaneous nor subsequent conduct can give rise to deliberate indifference, meaning that plaintiffs' heavy reliance on the manner and means by which Officer Pazak allegedly handled the Incident in the present case *cannot* be used to bolster an argument for causation under § 1983. See Connick, 131 S. Ct. at 1360 n.7. Therefore, plaintiffs' § 1983 claim against the Township also fails under a failure to train theory.

**V.**     **Conclusion**

For the reasons set forth above, defendants' motion for partial summary judgment with respect to Count V will be granted, and an appropriate order will be entered.

Dated: August 2, 2013

By the Court:

<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
United States District